IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SANDRA MARSH,

                Petitioner,

    vs.                                             No. CIV 95-360 JC/LFG

TOM NEWTON, Warden,

                Respondent.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

1. This is a proceeding on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed April 3, 1995. Respondent filed his Answer on July 6, 1995. Petitioner Sandra Marsh ("Marsh") challenges the judgment and sentence entered by the Fifth Judicial District Court in State v. Marsh, No. CR 86-47-F (County of Lea, New Mexico). A jury found Marsh guilty of conspiracy to traffic in heroin, and trafficking in heroin. Marsh appealed, the New Mexico Court of Appeals affirmed, and the New Mexico Supreme Court denied certiorari. Marsh filed two state habeas actions.

2. Marsh presents the following grounds for federal habeas review:

Ground One: The trial was fundamentally unfair due to prosecutorial misconduct, failure of the trial court to grant a mistrial, ineffective assistance of counsel, and insufficient evidence to support the convictions.

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommenda-tions. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

Ground Two:  The sentencing was fundamentally unfair due to ineffective assistance of counsel.

3.  Respondent concedes, and this Court finds, that Marsh exhausted her available state remedies and the petition is properly before the Court.

4.  The facts pertinent to this petition are as follows.  Marsh's attorney, Barry Crutchfield ("Crutchfield"), was an experienced criminal defense lawyer at the time he represented Marsh in 1987.  For at least three of his prior sixteen years of legal experience, he exclusively performed criminal defense work as a U.S. Marine Corps lawyer and served as a Marine judge.  Following his discharge from the Marine Corps and entry into private practice, he devoted between thirty to fifty percent of his time to criminal defense work, and prior to 1987, had conducted fifty to sixty trials involving drug-related cases.  Indeed, he represented Marsh in prior drug cases.  In 1987, at the time of trial on the charges involving cocaine and heroin, Marsh was appealing a prior cocaine conviction.

Crutchfield described the heroin charge on which she was tried as a "hit-and-run operation," where an informant comes in, gets the sale, and runs out.  Marsh's defense theory was that the incident never occurred.  (Deposition of Barry Crutchfield, May 6, 1997 [hereafter, "Crutchfield Dep."], pp. 17-18)  She denied ever selling heroin to the government's witness, Sheriff's Detective Sharon Berry ("Berry").  Marsh claimed that the government's position was "all lies," and that she had been set up.  (Crutchfield Dep., pp. 17-18).  As a result of Marsh's emphatic denials to her attorney, Crutchfield was left to defend the charges on the basis that the incident didn't occur; that Marsh never sold heroin; and that the State's witnesses were lying.  Crutchfield testified that he was forced to "take on the State" and defend as if the claim of a drug sale "was untrue."  (Crutchfield Dep., p. 17).

Prior to trial, the State made two plea offers. The first, for a 12-year sentence, was promptly rejected. The second disposed of all charges and had a five-year cap on incarceration. Crutchfield asked Marsh to seriously consider the plea, but Marsh rejected any plea. (Crutchfield Dep., p. 17).

Crutchfield cautioned his client concerning her proposed testimony that the incident didn't occur. He testified, "If the jury believes that you did sell it, we have got big, big problems." (Crutchfield Dep., p. 33).

During the course of the trial, Berry testified at trial that she purchased heroin from Marsh in September 1985. Berry revealed for the first time that, during September 1985, she made tape recordings of phone conversations between Marsh and herself discussing earlier drug transactions. Prior to this revelation, neither the prosecution nor the defense was aware of the existence of the tapes. Crutchfield had made standard requests for disclosure of information, and, at the preliminary inquiry, sought to learn if there were prior witness statements, tapes or recordings. Neither the district attorney nor Crutchfield knew of the tapes until Berry commented on them during trial.

When the existence of the tapes was made known at trial, the judge and the parties listened to them outside the presence of the jury. Crutchfield testified that when he heard the tape recordings, "It was crystal clear to me that this was Sandra Marsh making a deal for heroin." (Crutchfield Dep., p.18). He immediately moved for a mistrial, which the judge denied, ruling that the tapes could not be used for any purpose at trial. After the existence of the tapes was made known, Marsh changed her story to Crutchfield. (Crutchfield Dep., p. 22). In spite of the court's ruling concerning non-admissibility of the tapes, Crutchfield decided not to call Marsh to testify on her own behalf, even though he had already announced to the jury that she would testify. Crutchfield explained that even with the judge advising that the tapes could not be used for any purpose, there was always a risk that

the ruling could be modified and that under <u>Harris v. New York</u>, 401 U.S. 222, 91 S. Ct. 643 (1971), the tapes might be used for impeachment. (Crutchfield Dep., p. 19).

Berry further testified that she gave the substance which she purchased from Marsh to Rex Bogle ("Bogle"), a Hobbs police officer. Bogle described the material he received from Berry as a "tarry substance" and testified that he forwarded the packet on to the New Mexico Crime Laboratory. J.L. Jacobs ("Jacobs"), a chemist with the crime lab, testified that he was handed a packet by another chemist at the lab and that it had been sent registered mail and was still sealed when he received it. Jacobs, who described the substance as a "brown powder," tested it and found that it contained heroin.

At the close of the government's case, Crutchfield moved for a directed verdict on the cocaine charge and was successful in having the motion granted. Marsh was convicted, however, of trafficking in heroin and conspiracy. She was released on bond, but absconded and failed to appear for her sentencing hearing, whereupon, the court issued a bench warrant for her arrest. She avoided capture for nearly three years. She was apprehended in Kansas in 1990, under circumstances indicating that she had been involved with a methamphetamine lab. During the course of her arrest in Kansas, a police officer was injured as she attempted to escape. At her sentencing hearing in June 1990, the prosecutor stated to the court that Marsh had been involved in a methamphetamine lab in Kansas and that most of the charges arising from the Kansas events had been dismissed, but that he believed that there was still an outstanding charge against Marsh of attempted murder based on the injuries to the police officer. Marsh told the court that she had never been charged with attempted murder, and both she and her attorney stated that all Kansas charges against her had been dismissed. Under the circumstances, that is, Marsh's prior drug record, the present conviction, which occurred

while on appeal from a prior drug conviction, her absconder status and undisputed information of some involvement with a methamphetamine lab while in Kansas, Crutchfield testified, "there was not a lot that could be said at sentencing." (Crutchfield Dep., p. 28). She was sentenced to consecutive terms of three and nine years on the two counts.

### Prosecutorial Misconduct and Failure of the Trial Court to Grant a Mistrial

5. Marsh contends that she was deprived of a fair trial because the prosecutor failed to disclose the existence of two tape recordings between Marsh and detective Berry discussing the drug transactions, and that this misconduct, and the trial court's failure to remedy it, prejudicially affected her defense. Although Marsh argues that the tapes are exculpatory, the Court is not so persuaded. Indeed, when her attorney heard the tapes, his view was that it was "crystal clear" to him that Marsh was making a heroin deal. In any case, Marsh's argument focuses more on prejudice in planning trial strategy rather than on a violation under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). Marsh argues that the failure to disclose the tapes made it impossible for trial counsel to properly prepare a trial strategy, to prepare for Berry's cross-examination, to evaluate available defenses, to meaningfully determine whether Marsh should plead, and to decide whether she should testify in her own behalf.

6. Prosecutorial misconduct violates a defendant's right to a fair trial if the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Hoxsie v. Kerby, 108 F.3d 1239, 1243 (10th Cir.), cert. denied, 118 S. Ct. 126 (1997), quoting from Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974). Evidence undisclosed by the prosecution must be "material"; that is, there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

United States v. Hughes, 33 F.3d 1248, 1251 (10th Cir. 1994). Under this standard, the Court cannot conclude that the failure of the State to make pretrial disclosure of the taped conversations denied Marsh a fair trial.

7. Marsh has not demonstrated how knowledge of the tapes would have facilitated a more effective cross-examination of Berry, nor how such knowledge would have enabled her to better evaluate her available defenses. When a defendant claims that the state did not disclose information that would have been helpful in cross-examination, the applicable test is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Hughes, 33 F.3d 1248, 1251 (10th Cir. 1994).

> The Confrontation Clause prevents restrictions on cross-examination that effectively emasculate the right of cross-examination itself. [Citation]. The Confrontation Clause does not require that the prosecution disclose evidence that would help the defense effectively cross-examine a prosecution witness . . . [it] only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. [Internal punctuation marks omitted].

Coleman v. Calderon, 150 F.3d 1105, 1112-13 (9th Cir. 1998), rev'd on other grounds, 525 U.S. 141, 119 S. Ct. 500 (1998).

8. Marsh alludes to the possibility of an entrapment defense based on the taped conversations and implies that it is this defense that would have been the subject of cross-examination had she known about the tapes prior to trial. This argument, however, is flatly contradicted by her representations to her own lawyer. Her defense theory was that the sale never took place and that

Berry was lying. She adamantly denied making any sale to Berry. Based on her representations to Crutchfield, the entrapment defense was not available to her. A person is entrapped when that person had no previous intent, disposition or willingness to commit the crime charged and is induced or persuaded by a government agent to commit the offense. United States v. Gama, 141 F.3d 1186 (10th Cir. 1998). Here, Marsh claimed not to have made a sale, and, thus, not to have committed the crime. Therefore, she could not argue that she was induced or persuaded to do something she denied ever doing. It was only at trial, when confronted with the tapes, that she changed her story.

Marsh characterizes the tapes as exculpatory in that they portray an eager buyer and a noncommittal seller. However, she also argues that the tapes support her version of the events which, as presented at the sentencing hearing, is that she intended to sell Berry not heroin, but rather a counterfeit substance, as part of a scheme to become involved with the drug culture in order to become an investigative reporter. These arguments are self-contradictory; was she "noncommittal" and entrapped, or did she intend to sell Berry something, be it heroin or a substitute? Respondent, on the other hand, characterizes the tapes as inculpatory, in that Marsh acknowledges the earlier sale of "stuff" to Berry, agrees that the "stuff" is of low quality, responds affirmatively to Berry's question about getting "some better stuff," and volunteers to lower the price due to the poor quality. Marsh also states that "this is good you just gotta get enough of it . . . If you just do enough." The tapes are not clearly exculpatory; rather, they support Respondent's version of events; that is, that Marsh sold heroin to Berry. Indeed, that is the "crystal clear" conclusion made by Marsh's attorney when he heard the tapes. There is no reasonable probability that disclosure of the tapes prior to trial would have changed the result by allowing Marsha's attorney to better cross-examine Berry or to evaluate an entrapment defense. "[I]t should take more than supposition on the weak premises offered by [the

defendant] to undermine a court's confidence in the outcome." Wood v. Bartholomew, 516 U.S. 1, 8, 116 S. Ct. 7, 11 (1995).

9. Marsh also contends that knowledge of the tapes might also have affected her decision to accept a plea offered by the State. The record demonstrates that the State made two plea offers to Marsh. The first called for a twelve-year sentence. The second placed a five-year cap on the time Marsh would serve. Marsh rejected both pleas, even though her attorney encouraged serious consideration of the second plea. Marsh's position is that she didn't sell any heroin; she wouldn't accept a plea.

However, as Respondent points out, the prosecutor was as unaware as Marsh of the existence of the tapes until Berry disclosed them in her testimony, and thus both parties were in the same position with regard to plea negotiations. Given the less-than-exculpatory nature of the tapes, had the prosecutor known of the tapes before hand, the State might not have offered Marsh any plea deal at all, or perhaps would have offered a substantially less favorable one. The Court declines to engage in several layers of speculation regarding what the parties might have done with regard to plea agreements if one or both of them had known about the tapes earlier. A judgment based on speculation as to whether undisclosed information would have changed a result is improper in a habeas proceeding. Wood v. Bartholomew, supra, 516 U.S. at 6.

10. Marsh further contends that failure to disclose the tapes prejudicially affected her ability to decide whether or not to testify in her own behalf at trial. Marsh originally intended to testify, and her attorney so informed the jury before he knew that the tapes existed. Once Berry revealed the existence of the recordings to the jury, Crutchfield moved for a mistrial, arguing that his client could not take the stand and risk cross-examination based on issues for which the defense had not prepared.

The trial court denied Marsh's motion for a mistrial, but ordered the prosecution not to use the tapes at trial for any purpose. In spite of this ruling, Marsh chose not to testify. She contends that, if she had taken the stand and answered questions about the tapes, she would be subject to rebuttal questions for which the defense was not prepared; or, if she failed to mention the tapes at all in her testimony, the jury would speculate on her silence. Furthermore, Marsh argues, if her attorney had known about the existence of the tapes, he might have prepared the defense using other witnesses, not relying on Marsh's testimony at all. Nowhere does Marsh argue that the tapes are fake or that the matters recorded have been improperly dubbed, fraudulently created or "doctored." She only challenges the conclusions that should be drawn, not the statements made. She never denies that she is the one who was recorded. Thus, Marsh knew, prior to trial, of the conversations and of the probability that Berry would relate the conversations. Thus, Marsh cannot convincingly argue that had she known of this evidence in advance, Marsh would have made different decisions.

11. The decision whether or not to testify in one's own defense is one of the most important decisions a defendant will face in a criminal trial; it constitutes the exercise of a constitutional privilege. Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229 (1965). Marsh claims that her decision not to testify was not freely made, but rather was forced by the "ambush" manner in which the existence of the tapes was revealed. She argues that she would have been forced into a catch-22 situation, as described above. However, the decision not to testify was based on her counsel's assumption that, even if the court ruled the evidence inadmissible in the prosecution's case-in-chief, the tapes could nevertheless come before the jury as impeachment evidence under the rationale of Harris v. New York. In Harris, defendant's confession was inadmissible in the prosecution's case in chief because he had not been given Miranda warnings; however, the court held that the confession

could be used for impeachment, since otherwise the defendant would have a free hand to perjure himself with impunity. But, Harris does not stand for the proposition that any evidence which goes to impeachment will automatically be admitted. A court always has discretion to forbid the use of evidence, even for purposes for impeachment, if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, Fed. R. Evid. 403; for example, where the jury might have difficulty confining the use of the evidence to impeachment. United States v. Ince, 21 F.3d 576, 580-81 (4th Cir. 1994).

12. In this case, the trial court ruled explicitly that because the tape recordings had not been disclosed prior to trial, they could not be used *for any purpose*. This was not the situation in Harris, where a confession was inadmissible because of a prior judicial ruling designed to sanction police overreaching; there was no ruling in Harris that the confession could not be used for any purpose at trial. Marsh's concern, therefore, is misplaced. The extent and scope of cross-examination of witnesses and of impeachment evidence rests, to a large degree, within the sound discretion of the trial court, Lewis v. Owen, 395 F.2d 537 (10th Cir. 1968), and the court that ruled the tape evidence inadmissible "for any purpose" likely would not have allowed the State to introduce the tapes for impeachment, rebuttal, or for any other purpose. Therefore, Marsh was not forced to reverse her decision to testify, as she was not in danger of opening the door to admission of the tapes. Instead, it seems that she and her counsel voluntarily made a tactical decision not to testify.

13. Marsh also argues that, if she had taken the stand, but failed to mention the tapes, the existence of which had been rather dramatically placed before the jury, the jury would speculate about why she didn't discuss this newly revealed evidence in her testimony. And, she contends, her failure to testify after her counsel announced that she would take the stand probably caused the jury to

speculate as to the reasons.  However, unless the prosecution or the court comments on the silence of the accused, the fact that a jury may infer certain things from the evidence or absence of evidence is not a constitutional consideration.   The inference of guilt from silence is not necessarily natural or irresistible.  <u>Griffin v. California</u>, 380 U.S. at 614-15.  Even where a prosecutor actually comments on a defendant's failure to testify, such an error can serve as a basis for habeas relief only if it had substantial and injurious influence in determining the jury's verdict.  <u>Nethery v. Collins</u>, 993 F.2d 1154, 1159 (5th Cir. 1993).  In this case, the prosecutor made no comment on Marsh's decision not to testify.  Even though the jury was told she would testify, and she later changed her mind and decided not to take the stand after all, the Court cannot assume that the jury speculated about this sequence of events, nor that it had a substantial prejudicial effect in determining the jury's verdict

14.  Finally, Marsh argues that once Berry revealed the existence of the tapes, the trial court erred in not granting her motion for a mistrial.  She contends the court's order that the prosecutor could not use the tapes was "plainly an inadequate remedy."  Her argument is not persuasive.  The question whether to declare a mistrial based on prosecutorial misconduct is a matter left to the sound discretion of the trial court, which must examine whether the error had a prejudicial impact when viewed in the context of the entire case and whether manifest necessity compels a declaration of a mistrial.  <u>United States v. Gabaldon</u>, 91 F.3d 91, 94 (10th Cir. 1996).  Even if  the prosecution's failure to disclose the tapes amounted to misconduct, the trial court's task in ruling on the motion for a mistrial was to assess whether the misconduct had a prejudicial impact "consider[ing] the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case."  <u>United States v. Gabaldon</u>, at 94, quoting from <u>United States v. Ivy</u>, 83 F.3d 1266, 1288 (10th Cir. 1996).  It is only if the misconduct was flagrant enough to

influence the jury to convict on grounds other than the evidence presented that the court would be justified in declaring a mistrial. Gabaldon, at 94.

In the present case, the trial court ordered that the tape evidence not be used in any way and then proceeded with the trial. The prosecution neither used the tapes at trial nor commented on Marsh's decision not to testify. It was not an abuse of discretion to proceed with the trial; on the contrary, the court's order was an appropriate and measured response to an unfortunate and unexpected situation.

## Ineffective Assistance of Counsel in Failing to Investigate Chain of Custody Issue and Other Matters

15. Marsh contends that she was denied effective assistance of counsel at trial, because her attorney: (1) did not investigate the possibility that the substance which Marsh sold to Berry was not actually heroin; (2) did not attempt to obtain Berry's personnel records for possible impeachment material; and (3) did not meaningfully interview or consider calling two witnesses at trial.

16. To establish ineffective assistance of counsel, Marsh must make a two-prong showing: (1) that counsel's performance was constitutionally defective; and (2) that the deficient performance prejudiced the defense in that counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); accord, Rogers v. United States, 91 F.3d 1388, 1391 (10th Cir. 1996). To prove deficient performance, Marsh must overcome the presumption that counsel's conduct was constitutionally effective. Duvall v. Reynolds, 139 F.3d 768, 776 (10th Cir.), cert. denied, 119 S. Ct. 345 (1998). Scrutiny of counsel's performance must be "highly deferential" and must avoid the distorting effects of hindsight. Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995). In order to be found

constitutionally ineffective, trial counsel's performance must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy. <u>Hoxsie</u>, at 1246. Trial counsel's performance in this case was not "completely unreasonable."

17. Marsh argues that her attorney, Crutchfield, knew before trial that there were problems proving the chain of custody of the substance Marsh gave to Berry, which laboratory tests showed to be heroin, and that Marsh told him the substance was not heroin at all. In these circumstances, she argues, Crutchfield should have investigated further and requested that the substance be re-tested, and his failure to do so constitutes ineffective assistance of counsel. Berry purchased the substance from Marsh and gave it to Bogle, a Hobbs police officer. Bogle described it as a "tarry substance." Bogle forwarded the substance to the New Mexico Crime Laboratory. Jacobs, the crime lab chemist who tested the substance, testified that he had no first-hand knowledge of how the package arrived at the lab, but that it was handed to him by another chemist at the lab, John Garcia ("Garcia"), and that it was apparent from the package that it had come by registered mail and was sealed. Jacobs testified that the package he received from Garcia contained a "brown powder." He tested it and found that it contained some heroin.

Marsh argues Crutchfield should have been alerted, by the following circumstances, to investigate the substance further and have it retested: Jacobs did not receive the package directly from Bogle, Jacobs' description of the substance differed from Bogle's, and, during the course of trial, after disclosure of the damning tapes, Marsh told Crutchfield that the substance she sold Berry was not really heroin at all. Failure to further investigate, she contends, amounts to ineffective assistance of counsel.

18. Respondent acknowledges that the evidence of the chain of custody in this case is "slightly

attenuated." However, he points out that although Jacobs referred to the substance which he received at the lab as a "brown powder," and Bogle described the substance he got from Berry as a "tarry" substance, both Jacobs and Bogle had State's Exhibit 2 in front of them when testifying, and both witnesses stated that the substance in Exhibit 2 appeared to be the same as it was when each witness first saw it. Bogle stated that the substance was in the same condition as when he first saw it, except that most of the tarry substance had been removed.

19. Crutchfield moved to exclude Exhibit 2 based on problems with chain of custody, and the motion was denied. Marsh argues that she told her attorney that she did not sell heroin, but rather a substance concocted to look like heroin, and once the two witnesses gave varying descriptions of the substance, Crutchfield should have done more than move to exclude the exhibit; he should have sought to have the substance retested, and he should have moved for a directed verdict on the heroin trafficking charge. This argument again belies the facts. Marsh had been adamant that the incident never took place and there was never a sale. At no time prior to trial did Marsh suggest that she sought to sell a counterfeit drug or that what she sold was something other than heroin. She never suggested to her attorney before trial that she was pretending to sell drugs as a way of becoming an investigative reporter. It was not until the actual trial, when Marsh's story was discredited, that she admitted the sale, but denied the substance was heroin. (Crutchfield Dep., pp. 18, 22).

Counsel has a duty to make reasonable investigations, or to make a reasonable decision that makes particular investigations unnecessary. Nguyen v. Reynolds, 131 F.3d 1340 (10th Cir. 1997), cert. denied, 119 S. Ct. 128 (1998). The record in this case indicates that Marsh's attorney made a reasonable decision that further investigation, or retesting, would not have been fruitful. Based on Marsh's original story, there was no issue concerning whether the substance was or was not heroin.

Her position was that she never made a sale, not that the sale she made wasn't heroin. Crutchfield testified in his deposition that he would not have asked that a substance be retested unless there had been something very solid to indicate a problem, and he didn't see such a problem in this case. (Crutchfield Dep., pp. 44-45). He could reasonably have attributed the varying descriptions given by Bogle and Jacobs to differences in perception and descriptive ability, especially since both were testifying with Exhibit 2 in front of them at the time, rather than evidence that the substance tested was not the same substance that Berry bought from Marsh. This, coupled with the fact that Crutchfield's past experience with the Crime Lab had never given him reason to doubt the lab's results, seems to be the basis for his statement that Count III, the trafficking charge, presented a factual issue and could not be disposed of on a directed verdict. His decision not to seek a directed verdict on this charge, therefore, was not unreasonable. During trial, when the existence of the tapes was made known and Marsh back peddled on her story, it was too late to have the substance retested. Moreover, there was no reasonable basis to request a retesting.

20. Furthermore, there is no evidence that Marsh told Crutchfield, prior to revelation of the existence of the tapes, that the substance she sold to Berry was not real heroin, but merely a fake substance made up to look like heroin. Marsh submitted an affidavit with her Memorandum Brief in Support of Her Petition for Writ of Habeas Corpus, in which she states that she explained to her attorney that the substance she sold was not really heroin. She does not state when she told her attorney this. Crutchfield testified in his deposition that Marsh told him from the outset of the case that she had not sold heroin to Berry, that she was set up, and that someone else must have been the one who sold it. (Crutchfield Dep., p. 16-18). He stated further that it was not until revelation of the tapes, in which Marsh was heard to confirm that she sold "stuff" to Berry, that Marsh changed

her story and told Crutchfield that she had in fact sold something to Berry, but that something was not heroin. Crutchfield had formulated his trial strategy based on his client's statements that she did not sell anything to Berry. It was not until after trial commenced that his client changed her story and claimed that she sold something innocent, not heroin, to Berry. (Crutchfield Dep., pp. 18, 22-24.; 34-36).

A defendant cannot charge ineffective assistance of counsel when defendant herself withholds the essential information required to trigger such an investigation. United States v. Rhodes, 913 F.2d 839, 844 (10th Cir. 1990).

21. Although Marsh argues that Crutchfield's knowledge that the substance might not be heroin, coupled with the chain of custody problems, should have prompted him to seek a directed verdict and/or to have the substance retested, the Court finds that Crutchfield had no reason to suspect that the substance was anything but heroin until his client changed her story after trial had already begun, and he reasonably concluded that the chain of custody problem was significant enough to justify a motion to exclude, but was not so clear that the evidence should be removed from the jury's consideration by a directed verdict.

22. Crutchfield could also reasonably have concluded that retesting the substance would not have accomplished anything helpful to his client. Marsh implies that Exhibit 2, which Jacobs described as a brown powder, was either through inadvertence or design substituted for the substance which she sold to Berry, described by Bogle as a tarry substance. If this is so, the fate of the original tarry substance is a mystery. The only material available for retesting would have been Exhibit 2, and presumably a retest would still have shown evidence of heroin. Retesting, therefore, would have done nothing to clarify the chain of custody issue, and Crutchfield was not unreasonable in failing to

request that it be done, particularly since he had had no problems with lab results in the past, and the problems with chain of custody were not severe.

23. Marsh next contends that Crutchfield was ineffective in that he didn't request and use Berry's personnel file in cross-examining her. Marsh filed an affidavit with her Memorandum Brief stating that she asked her attorney to attack the credibility of Berry, based a news broadcast "reporting abuse of her authority as a sheriff in Chavez County, N.M. and her reprimand by a court of law for professional misconduct." (Affidavit of Sandra Marsh, March 22, 1997, Exhibit A to Petitioner's Memorandum Brief). Crutchfield stated in his deposition that he was familiar with Berry, that he had cross-examined her in previous trials, and that he had no knowledge about her that would have led him to believe she was impeachable by her personnel file. (Crutchfield Dep., pp. 4, 32-33). His recollection was that Berry had been accused of preventing an attorney from seeing a client, a transgression having nothing to do with her truth or veracity as a witness. This information would not have been admissible under Fed. R. Evid. 404. Moreover, Crutchfield stated that in his experience, impeaching a witness on a minor or immaterial matter could easily backfire on a defense attorney, as it could appear to the jury that he was "picking on" the witness. (Crutchfield Dep., pp. 31-33). Crutchfield's decision not to obtain or use Berry's personnel file as impeachment fodder at trial was not completely unreasonable and can be justified as part of a sensible defense strategy.

24. Marsh also bases her "ineffective assistance" argument on Crutchfield's failure to meaningfully interview and call as witnesses Juan Rodriguez and Jimmy Franco. Again, Crutchfield's actions in this regard were not entirely unreasonable and do not constitute a failure to investigate, but rather demonstrate counsel's clear analysis and/or conscious choice of trial tactics. Crutchfield testified that he determined that both of these witnesses would not work well in front of the jury and

had the potential to harm, rather than help, Marsh's case. Jimmy Franco had once sent a letter to Marsh demanding money and stating, "I got something on you that might hurt you on the long run, if you don't pay me my money." (Crutchfield Dep., pp. 8-10). Crutchfield testified that Jimmy Franco, a person who "is trying to shake somebody down for money," would not have been a good witness; indeed, he would have been "a killer witness." (Crutchfield Dep., p. 46). Crutchfield felt that both Jimmy Franco and Juan Rodriguez were "unusual sorts;" and Rodriguez in particular was a "spooky looking guy" and wouldn't have made a good appearance, something which, in his experience, is important in a drug trial. (Crutchfield Dep., pp. 8, 34, 46-47). In addition, Rodriguez had at least one prior conviction, was always trying to make a deal, and Crutchfield "just didn't trust the guy" and felt he would "make a really bad witness." (Crutchfield Dep., p. 34). Generally, the decision whether to call a witness rests within the sound discretion of trial counsel, Jackson v. Shanks, 143 F.3d 1313, 1319 (10th Cir.), cert. denied, 119 S. Ct. 378 (1998), and such decisions involving trial tactics and strategy are "virtually unchallengeable." Strickland, at 690. It appears that Crutchfield's decision not to call Franco or Rodriguez as witnesses "was a tactical decision, well within the range of reasonable attorney performance." Hoxsie, at 1246.

### Sufficient Evidence to Support the Conviction.

25. Marsh bases her argument of insufficient evidence to support the conviction on the same reasoning given above, that is, that the State failed to prove that the substance she sold to Berry was actually heroin, because of problems with the chain of custody of the evidence.

26. Evidence is sufficient to support a criminal conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government. United States

v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994). As previously discussed, the Crime Lab found that the substance in State's Exhibit 2 contained heroin. Marsh's attorney made a motion to exclude the evidence, based on chain of custody problems, but this motion was denied, the trial court finding that the following evidence was sufficient to establish chain of custody: Berry testified that she purchased the substance from Marsh, initialed it and gave it to Bogle. He testified that he marked it and sent it by registered mail to the Crime Lab. Mr. Jacobs testified that he received a sealed registered mail package which had been handed to him by another lab chemist, and he tested the substance in the package and found that it contained heroin. All three witnesses who viewed Exhibit 2 at trial testified that the substance looked the same as when they had first seen it, although two witnesses described the substance in different terms. The chain of custody argument does not support Marsh's contention that the evidence was insufficient to convict.

### Ineffective Assistance of Counsel at Sentencing.

27. Marsh contends that her attorney's inaction in the face of improper remarks by the State at sentencing, and his failure to research and understand the law, constituted ineffective assistance of counsel at the sentencing phase, justifying remand for a new sentencing hearing. While the prosecutor may have inaccurately characterized pending criminal charges, Marsh failed to meet her burden of showing that Crutchfield's performance at the sentencing hearing was outside the range of professionally competent assistance and that there is a reasonable probability that, had he taken a different approach, the result of the proceeding would have been different.

28. Following her conviction, Marsh was released on bond pending sentencing. Sentencing did not occur for over three years, because Marsh absconded, fled the state and had been living in Kansas until she was captured and involuntarily returned to New Mexico. At the sentencing hearing,

the prosecutor told the court that Marsh had been involved with a methamphetamine lab in Kansas while she was a fugitive, that charges related to the lab may have been dismissed, but there might still be pending an attempted murder charge based on her injuring a police officer upon attempting to escape arrest. Marsh was given the opportunity to respond to these claims at the hearing. She did not deny that she had been involved with a methamphetamine lab, nor did she deny the allegations that a police officer was hurt while trying to apprehend her, but she told the court that she had never been charged with attempted murder and that there were no charges then pending against her in the State of Kansas. Her attorney also told the court that, to the best of his knowledge, all of the charges in Kansas had been dismissed. Marsh bases her argument of ineffective assistance at sentencing on attorney Crutchfield's failure to object to the prosecutor's statement that attempted murder charges may be pending against her in Kansas, and on Crutchfield's incorrect assumption that New Mexico law required the judge to run her sentences consecutively.

29. A criminal defendant has a due-process right to have the court consider only accurate information when imposing sentence, United States v. Coonce, 961 F.2d 1268, 1275 (7th Cir. 1921); United States v. Browning, 61 F.3d 752, 755 (10th Cir. 1995), and failure of the defense attorney to object to inaccurate information at sentencing may constitute ineffective assistance of counsel. Nichols v. United States, 75 F.3d 1137, 1145 (7th Cir. 1996). To succeed on a claim that the court considered inaccurate information, petitioner must show that the information was indeed inaccurate, and that the court relied on it in passing sentence. Coonce, at 1275. The misinformation must have resulted in an error of fact "so fundamental that it rendered the sentencing proceeding irregular and invalid." United States v. Blackwell, 127 F.3d 947, 953 (10th Cir. 1997) (§2255 case). Although the court must base sentencing on reliable evidence, there are few restrictions on the type of

information the sentencing court may consider; hearsay, for instance, is allowable.  United States v.

Musa, 946 F.2d 1297, 1306 (7th Cir. 1991).

30.   The court could appropriately have considered the fact of Marsh's drug involvement:

"[W]hen sentencing, [a] court can consider evidence of criminal indictments and even evidence of

criminal activities for which no charges have been filed if [the] evidence is reliable."  Richardson v.

Johnson, 864 F.2d 1536, 1541 (11th Cir. 1989).  Even where prior convictions were invalid, the court

may consider "reliable evidence of the underlying criminal activity leading up to the convictions," and

therefore an attorney's failure to object to admission of the actual convictions would not necessarily

have changed the outcome of the judge's assessment of the defendant's past criminal activity.

Richardson, at 1541-42.  Marsh has the burden of demonstrating that her attorney's failure to object

to the prosecution's characterization of the status of the Kansas charges resulted in an invalid

sentencing proceeding.  There is nothing in the record to indicate that the court relied on the State's

characterization, rather than on its own assessment, of Marsh's credibility and her underlying

activities while in Kansas.

31.   Marsh argues that her attorney failed to object to the prosecutor's misstatement.

Crutchfield did, however, inform the court that, to his knowledge, there were currently no pending

charges in Kansas, and Marsh herself informed the court that there were no pending charges and that

she had never been charged with attempted murder.  Marsh also faults Crutchfield for failing to

adequately investigate the facts so that he could advise the court of the actual status of the Kansas

charges, and that correct information might have resulted in a lesser sentence.  Although counsel does

have a duty to make reasonable investigations, "we assess the reasonableness of a particular decision

not to investigate for reasonableness in all the circumstances, applying a heavy measure of deference

to counsel's judgments [internal punctuation omitted]." Blackwell, at 955. Crutchfield stated in his deposition that he felt the Kansas charges were the least of their problems at the sentencing hearing, since Marsh had skipped bail and had been a fugitive for three years, and she did not controvert the evidence that she was involved with illicit drugs while in Kansas. (Crutchfield Dep., pp. 26-27). Crutchfield could reasonably have concluded that it would be counterproductive to emphasize Marsh's behavior during the time she was in Kansas after skipping bail, especially since the prosecutor's inaccuracies involved his description of the charges resulting from this behavior, rather than the behavior itself. In Richardson, an attorney failed to contest admissibility of prior convictions, because he did not want to risk having his client further discredited by an inquiry into the circumstances of the charges or to focus attention on the events leading up to them. The court found that the attorney's failure to contest the use of these convictions at sentencing was within the "wide range of professionally competent assistance" and that petitioner had failed to meet his burden of showing a reasonable probability that, but for counsel's unprofessional efforts, the result of the proceeding would have been different. Richardson, at 1541-42.

32. Marsh has also failed to show any influence on the sentence arising from Crutchfield's assumption that New Mexico law required the judge to impose consecutive sentences. Crutchfield could have made different arguments at sentencing, but "[h]indsight does not weigh into the reasonableness or adequacy" of an attorney's performance, Blackwell, at 955, and there is no indication that the judge made the same assumption as Crutchfield. Marsh's speculation that the trial judge misunderstood or misapplied the law does not meet her burden of proof of showing a reasonable probability that, had Crutchfield made an argument regarding consecutive sentencing, the result of the proceeding would have been different. Moreover, Crutchfield noted that given the fact

that Marsh's convictions came while she was on release pending appeal of a cocaine conviction, she had fled the State; and she was involved in a methamphetamine laboratory while on absconder status, "there was not a lot that could be said" at sentencing. (Crutchfield Dep., p. 28).

## Recommended Disposition

That the motion be denied and the action dismissed with prejudice.


_____

Lorenzo F. Garcia
United States Magistrate Judge




ATTORNEY FOR PETITIONER:
Barbara A. Mandel, Esq.

ATTORNEY FOR RESPONDENTS:
M. Katherine Zinn, Esq.